HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

TYLER R. McDONALD,

Plaintiff,

v.

CITY OF TACOMA, et al.,

Defendants.

CASE NO. 11-cv-5774-RBL

ORDER

## I. INTRODUCTION

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment [Dkt. #53]. The Court has reviewed the materials filed for and against the motion. Oral argument is not necessary for the resolution of this motion.

## II. FACTS

### A. Uncontroverted Facts

On July 30, 2009, Tyler McDonald's father, Mark Widaman, called 9-1-1 and told the dispatcher that Tyler broke into his parents' home. They told Tyler to call his attorney and to turn himself in. The week before, Tyler had shot his girlfriend and fled with the gun.

Widaman reported that Tyler called his defense lawyer, who advised Tyler how many months he was likely to serve in prison. Tyler told his parents that he would rather die than go to

prison. Widaman said that he didn't know if Tyler had a weapon because Tyler said he threw the gun into the Sound. Widaman said Tyler was wearing a white T-shirt and white shorts, and he didn't see any weapon on him.

Widaman said Tyler's been doing sherm and meth (methamphetamine) and that his parents didn't believe what he was saying, but they called a Tacoma police detective who confirmed that the shooting, in fact, occurred.

Widaman told dispatch that Tyler had just left and run down North Hale, about a block from the Widaman residence. Tyler knew Andy Diaz, who lives on North Hale. Tyler and Diaz have dealt drugs and used drugs together frequently. Widaman said: "I don't know if he's gonna hide out there."

Dispatch informed officers that Tyler McDonald should have a warrant as a suspect in a shooting in University Place, that he was not known to be armed at this point, and that he had made suicidal threats.

One of the officers reported that he was "good" for a Domestic Violence (DV) burglary too. A Pierce County Sheriff's Deputy informed police that Pierce County had probable cause to arrest Tyler McDonald for an unrelated burglary.

Sgt. Kelly arrived at North Hale and ran license plates in the immediate vicinity and confirmed Andy Diaz's residence. Two additional officers arrived at North Hale. The two officers (O'Rourke and Olson) went to the front door, while Sgt. Kelly placed himself at the Southeast corner of the residence, where he could look into the unfenced backyard and the rear of the house.

Sgt. Kelly saw an open sliding glass door covered with a blanket and with a running air conditioner sitting on the sill. When the officers knocked on the front door and announced their

presence ("Tacoma Police"), Sgt. Kelly saw a pair of hands appear from under the blanket and grab at the air conditioner, as if to pull it inside.

Sgt. Kelly announced his presence, and Andres Diaz peered out from under the blanket. Sgt. Kelly directed Diaz to come out of the house. As Diaz complied, Sgt. Kelly heard movement from behind the blanket and a door slam. Diaz was placed in handcuffs.

Sgt. Kelly asked Diaz if anyone was inside the house, and Diaz said that Tyler McDonald was, and Diaz's nephew, who Kelly presumed to be a minor.

Sgt. Kelly saw a toddler sitting on a bed inside the room. He entered into the room to place himself between the toddler and the bedroom door leading into the rest of the house.

Tyler McDonald was under the influence of methamphetamine and admittedly not thinking clearly. He was looking for a way out of the house to evade capture.

Sgt. Kelly had drawn his weapon and called out to McDonald: "Tyler, Tacoma Police. I can see you." Tyler continued to move about the house to find an exit. He then came out to the area of the front door. He raised his hand, with his wallet in hand, and was shot by Sgt. Kelly.

While lying wounded, Tyler McDonald said: "Kill me."

**B. Contested Facts**

**1. Sgt. Kelly's Perspective**

According to Sgt. Kelly, Plaintiff suddenly reappeared near the front door, facing the officer and with both hands behind his back. Sgt. Kelly again yelled for Plaintiff to show his hands and again, Plaintiff refused to comply.

Suddenly, Plaintiff brought both hands out from behind his back at the same time and extended them in front of his body in what appeared to be a firing stance. He had a dark object in his hands and pointed directly at the officer's head. Believing Plaintiff was going to shoot him

in the head, Sgt. Kelly simultaneously ducked and fired his weapon multiple times, striking Plaintiff.

### 2. Tyler McDonald's Perspective

> [W]hen I heard "Tacoma Police Department," obviously, you look at my past, I run, usually from everything. And I had gone around and looked for a way out, . . . [the door] was closed and I believe [another] door was closed too, and all there is [is] a closet right there, and I got about halfway down the hall and . . . turned around and . . . that's when I saw Darren Kelley.
>
> . . .
>
> I made it to the front door, and I was panicking, looking for a place to run, and it was once I got to the front door that I heard, "get on the ground," and I turned around, and there was the officer with his gun drawn on me.
>
> . . .
>
> I realized there was no way to go, cops were in front of the house, so I raised my hands because I had to get on the floor like that . . . . From my first residential burglary, the police yelled to us to get out of the car and get on the ground. They made it really clear that we had to put our hands up first and get on our knees first and then put your hands down and spread out and all that. . . . I let out a sigh and I was shot.

Purtzer Aff., Ex. K at 84–90, Dkt. #61.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words,

"summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1221.

## IV. ARGUMENT

### A. Unreasonable Search

The Fourth Amendment prohibits unreasonable searches and seizures. A warrantless entry into one's home violates the Fourth Amendment unless an exception to the warrant requirement applies, such as exigent circumstances. *Espinosa v. City & County of San Francisco*, 598 F.3d 528, 533 (9th Cir. 2010). Fourth Amendment rights are personal rights, which like some other constitutional rights, may not be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978). The claimant must establish that he personally had a legitimate expectation of privacy in the premises he was using and therefore could claim the protection of the Fourth Amendment with respect to a governmental invasion of those premises. *Id*. at 143. The Supreme Court has carefully examined the surrounding circumstances to determine whether a guest's status is sufficiently like home-occupancy so as to give rise to a reasonable expectation of privacy. In so doing, the Court has distinguished between "overnight guests" and those who were simply on the premises with the owner's permission. *Minnesota v. Carter*, 525 U.S. 83, 87–90 (1998). In the case of the overnight guest, the Supreme Court reasoned that an overnight guest seeks shelter in the host's home "precisely because it provide[d] him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows." *Id*. at 89. Thus, the overnight guest's expectation of privacy is recognized and a shared societal norm. *Id*. The Court contrasted overnight guests with persons simply present on the premises, even with the owner's permission, and concluded that "an overnight guest in a home

may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Id*. at 90.

In the case at bar, Tyler McDonald possessed none of the indicia of temporary home-occupancy. He arrived 10 minutes before the police arrived. According to his father, Tyler was just looking for a place to hide and avoid apprehension. He had the clothes on his back: T-shirt, gym shorts with pockets, his wallet, gym socks and shoes, and a pair of jeans that he carried into the Diaz residence. He didn't have a reasonable expectation of privacy. The search did not violate Tyler McDonald's right to freedom from unreasonable search.

For good measure, the search was justified by exigent circumstances. As officers posted themselves outside the Diaz residence, they were armed with the knowledge that they had probable cause to arrest Tyler McDonald, and they suspected McDonald was likely in the house. They knocked at the front door and announced themselves as police. Curiously, no one came to the front door, yet someone went to the back door and removed the air conditioning unit from the open door in preparation for closing the sliding glass door. Andy Diaz, the person at the back door, was summoned out by the police. He confirmed that Tyler McDonald was in the house as was his minor nephew. At that moment, exigent circumstances justified entry without warrant or permission. The officers were presented with a serious dilemma: a suspected felon (three times over), who had recently shot his girlfriend and threatened to kill himself is in the house with a potential hostage or hostages. Sgt. Kelly could choose to confront and apprehend a suicidal McDonald immediately, or he could back away and call negotiators, but simultaneously create a hostage situation. There are good reasons for each choice, but the presence of choices does not lessen the validity of the intrusion into the house. For that reason, Plaintiff's Motion for Partial Summary Judgment [Dkt. #50] is **DENIED**.

**B. Excessive Force**

Defendants' Motion for Summary Judgment seeking dismissal of Plaintiff's excessive force claim rests on logic and common sense. The Fourth Amendment requires a careful balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989). An officer's use of force is measured under an objective reasonableness standard, in light of the totality of the circumstances. In applying this standard, courts have repeatedly stated that the "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id*. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments in circumstances that are tense, uncertain, and rapidly evolving. *Id*. at 396–97. The use of deadly force is reasonable where the officer has probable cause to believe the suspect poses a threat of death or serious physical harm to the officers or others. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

Sgt. Kelly argues he was justified in believing that Tyler McDonald posed a threat of death or serious bodily injury. The account of events—which is essentially the same from both parties—provided by the officers has a ring of truth to it. The Court, however, must view the evidence in the light most favorable to the nonmoving party and determine whether there are any genuine issues of material fact. *CRM Collateral II, Inc. v. TriCounty Metro. Transp.*, 669 F.3d 963, 968 (9th Cir. 2012).

Tyler McDonald admits that he was instructed to get to the ground, but instead raised his hands while holding a wallet (which he explains that he was holding because he had no pockets, despite a photo of his blood-stained gym shorts that clearly show pockets). He argues, however, that he never made any quick or aggressive movements and believes that Kelly could not have

reasonably interpreted his noncompliance as dangerous. There is no disagreement about the facts. McDonald's only argument is that Kelly should have interpreted his split-second motion as non-lethal. The law, however, requires the Court to judge reasonableness from the perspective of the officer—not the suspect. Kelly need not have waited to be shot to find out whether or not the object in McDonald's hand was in fact a wallet not a weapon. Defendants' Motion for Summary Judgment on this claim is **GRANTED**.

### C. Municipal Liability

In order to establish a claim against a municipality under § 1983, the plaintiff must show that he was deprived of his constitutional rights and that this deprivation was proximately caused by an official policy, custom or practice, that amounts to deliberate indifference. *Monell v. Dep't of Soc. Serv. of New York*, 436 U.S. 658, 690–91 (1978).

A plaintiff may establish municipal liability in one of three ways: First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the "standard operating procedure" of the local government entity. Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an action of official governmental policy. Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it. *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992). After proving that one of these three circumstances existed, a plaintiff must also show that the municipality's action was the cause of the constitutional deprivation. *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

**1. Failure to Train**

Inadequate police training may serve as the basis for § 1983 liability where the failure to train "amounts to deliberate indifference to the [constitutional] rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1988); *Connick v. Thompson*, 131 S. Ct. 1350 (2011). The issue is "whether the training program is adequate and, if it is not, whether such inadequate training can justifiably be said to represent municipal policy." *Long v. County of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006).

Plaintiff contends that police are required to deal with the mentally ill and emotionally disturbed on a regular basis and that training or dealing with the emotionally disturbed and/or suicidal person is necessary and must be provided. He claims that "institutionalized ignorance of how to deal with emotionally disturbed and potentially suicidal individuals . . . led to Sgt. Kelly's improper handling of Mr. McDonald's situation." Memo in Opp'n to Defs.' Motion for Summ. J., 16:16–18 [Dkt. #60].

Nothing about the entry into the residence was improper and nothing about Sgt. Kelly's training was lacking. In fact, Sgt. Kelly has received numerous trainings on how to deal with emotionally disturbed persons, beginning at the Basic Law Enforcement Academy and continuing thereafter. Just two months before the shooting involving Tyler McDonald, Sgt. Kelly completed training on "suicide by cop."

From the record before the Court, there seems to be no flaw in the training or the timing of the training in relation to this shooting. The City of Tacoma did not fail to train Sgt. Kelly for the precise challenge he faced on the evening of July 30, 2009. The *Monell* claim on the basis of failure-to-train is **DISMISSED**.

**2. Ratification by Policy-Making Official**

Plaintiff may also succeed on a *Monell* claim by proving "that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992). If the authorized policy-makers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final. *Bouman v. Block*, 940 F.2d 1211, 1231 (9th Cir. 1991).

After the shooting the police department convened a Shooting Review Board that conducted an investigation, deliberated, and found the shooting justified. Chief Donald Ramsdale reviewed the findings of the Shooting Review Board and approved its recommendation. Plaintiff criticizes the recommendation of the Shooting Review Board and the approval by the Chief because the standards that apply to a legal search or seizure are not provided to members of the Shooting Review Board. Because the legal standards for "exigent circumstances" and for "reasonable expectation of privacy" were not violated here, this case does not, therefore, turn on the propriety of the entrance into the house or ratification of that decision.

**D. Punitive Damages**

A municipality is immune from punitive damages under 42 U.S.C. § 1983, *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981), however, a plaintiff can pursue punitive damages against municipal officials sued in their official capacity, provided the requisite intent is established. *Memphis Cmty. Sch. Dist. v. Stachupa*, 477 U.S. 299 (1986). Punitive damages are available under 42 U.S.C. § 1983 only when a defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to federally protected rights of others. *Smith v. Wadez*, 461 U.S. 30 (1983). This

standard is premised upon the subjective intent of the defendant. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999).

The agreed facts in this case establish that Sgt. Kelly sought to apprehend Tyler McDonald because he was wanted for multiple felonies, one violent, and because he was threatening suicide. He confronted McDonald with verbal commands. McDonald delayed complying with Sgt. Kelly's command to show his hands and get on the floor. Under either scenario testified to by McDonald or Sgt. Kelly, McDonald raised his hands with his wallet in his hand(s) and he was shot. Nothing from the uncontroverted facts can convince a reasonable jury that Sgt. Kelly was motivated by evil motive or intent or reckless or callous indifference. Sgt. Kelly did not intend to execute Tyler McDonald on that tragic evening and Tyler McDonald has not contended otherwise. The punitive damage claim is **DISMISSED**.

**E. Qualified Immunity**

For qualified immunity, the Court must determine whether the facts show that (1) the officer's conduct violated a constitutional right; and (2) the right which was violated was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "A right is clearly established if a reasonable officer would know that his conduct was unlawful in the situation he confronted." *Espinosa v. City & County of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010).

> Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

*Pearson v. Callahan*, 555 U.S. 223–31 (2009). Thus, qualified immunity shields government officials so long as their actions could reasonably have been thought consistent with the rights

they are alleged to have violated. *Anderson v. Creighton*, 483 U.S. 635 (1987). The doctrine "protects all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Plaintiff's emphasis during his rebuttal of qualified immunity is on Sgt. Kelly's entry into the house—not on the shooting. He argues that Sgt. Kelly had no probable cause to search a dwelling for a suspect because he lacked a reasonable belief that the suspect had committed a crime and would be found in the place to be searched. *United States v. Robertson*, 606 F.2d 853, 858 (9th Cir. 1979). He is wrong. Sgt. Kelly reasonably believed that Tyler McDonald was a violent felon, suspected of three felonies and one violent act only days before. When the officers confronted Andy Diaz outside the house, he confirmed that Tyler McDonald was inside the house with at least one infant. Sgt. Kelly possessed all the information that the law requires to enter the home and apprehend the suspect. Sgt. Kelly did not, therefore, violate McDonald's constitutional right against unreasonable search.

Once the argument fails that Sgt. Kelly provoked the confrontation by unlawfully entering the premises, Plaintiff is left with his deadly force/excessive force argument. Succinctly, the principles of Deadly Force Application enunciated by the Tacoma Police Department clearly express the contours of excessive force policy in practical terms.

> The Tacoma Police Department recognizes and respects the value of all human life. Procedures and training are designed to resolve confrontations prior to escalation to the point deadly force may be applied. During the performance of their duties and as a last resort, Officers may apply deadly force when confronted with an imminent danger of death or serious bodily injury to protect themselves or others.
>
> Officers are not required to place themselves or others in immediate danger of death or serious bodily injury before using deadly force. The necessity to use deadly force arises when there is no reasonable alternative to using such force and without it the

> Officers or others would face imminent danger of death or serious bodily injury.

*See* Purzter Decl., Principles of Deadly Force Application, Ex. P at 8 [Dkt. #61].

Clearly the right to be free from the use of excessive force was established in law long before the events of July 30, 2009. There can be no mistake of law on this matter. Instead, there is an issue of fact: either (1) Tyler McDonald presented a clear danger of imminent, serious bodily harm; or (2) this is a case of volitional attempted murder by an officer against an unarmed man. Tyler McDonald, if armed, was clearly a threat. If he was not armed and he was not perceived to be armed, then there was no need to shoot. However, Plaintiff does not allege an evil, despicable deed by Sgt. Kelly; he prefers instead to seek relief on an issue of law: entry into the Diaz residence. Faced with these arguments, taken in the light most favorable to the party asserting the injury, the only conclusion that can be made is that Sgt. Kelly reasonably thought the use of deadly force was reasonable under the circumstances. The parties are not in disagreement about the facts. McDonald was fleeing through the house, Kelly instructed him to get on the ground, he instead raised his hands at the officer while holding a black object, and was immediately shot. Sgt. Kelly was not "plainly incompetent"; he reasonably believed that the fleeing suspect was raising a weapon rather than getting to the ground. Plaintiff has not, and cannot, argue that Kelly held some sort of malice, and shot him for that reason.

For the foregoing reasons, the Motion for Summary Judgment [Dkt. #53] is **GRANTED** and the case is **DISMISSED WITH PREJUDICE**. Plaintiff's Motion for Partial Summary Judgment [ Dkt. #50] is **DENIED**. The remaining motions [Dkts. #69, 70, 71, 73] are **MOOT**.

Dated this 2nd day of April, 2013.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE